MARSHALL & E. T. RY. CO. v. BOAZ.

(Court of Civil Appeals of Texas. Texarkana. May 8, 1913. Rehearing Denied May 15, 1913.)

1. RAILROADS (§ 443*) — KILLING ANIMALS — EVIDENCE—SUFFICIENCY.

Evidence *held* not to support a finding that a train struck and killed an animal.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1543; Dec. Dig. § 443.*]

2. RAILROADS (§ 441*) — KILLING STOCK — BURDEN OF PROOF.

One suing a railroad company for the loss of an animal killed by a train must, to discharge the burden of proof, show that a train struck and killed the animal.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1575-1595; Dec. Dig. § 441.*]

Appeal from District Court, Harrison County; H. T. Lyttleton, Judge.

Action by E. P. Boaz against the Marshall & East Texas Railway Company. From a judgment for plaintiff, defendant appeals. Reversed and remanded for another trial.

R. A. Sexton, of Marshall, for appellant. J. H. T. Bibb, of Marshall, for appellee.

LEVY, J. Claiming that his horse was struck and killed by the appellant's locomo-tive, at a place where the railway company was not excused from fencing its track, the appellee brought the suit for damages. The appellant by proper assignment makes the contention that a finding that the horse was struck and killed by its train is not warranted by the evidence, and that as a consequence the judgment in favor of appellee is erroneous. After a careful consideration of all the evidence, we are constrained to conclude that the positive and affirmative evidence offered for the appellant so sufficiently and strongly shows that a locomotive did not strike the horse as to require such finding of fact, and that the circumstances offered by appellee did not sufficiently negative the fact as to warrant a verdict in his favor.

[1] The facts show that appellee was the owner of a horse about three years old, and he had placed it in the pasture of Mr. Hughes. The railway runs southwest through the pasture. Mr. Hughes, on Sunday morning of the 18th of June, 1911, missed seeing the horse as usual, and went into the pasture to look for it, and found it lying dead in a thicket on the north side of, and 30 steps away from, the track. He found the horse's left forefoot with two gashes nearly to the bone, and there was blood in the horse's nose and blood on the ground under his nose, and as well there was some blood on the weeds about there, and horse tracks where the blood was. The appellee was notified, and he and several others came at once to see the horse. They testify that they examined around the ground and found, at 140 steps east from where the horse was lying, and at the bottom of the railway dump, by a drain box, weeds were broken down, and it looked as if cattle had rolled down there, and as if there had been scuffling close to the rails, and at about seven steps from the railway track there was a puddle of blood. There was no blood on the railway track, and neither the skin nor hair was knocked off on any part of the body of the horse except the forefoot. A pine sapling was at the horse's feet where he was lying, and the bark was knocked off the sapling. On Monday the owner went back there and cut open the horse's neck, and the flesh was found to be black looking and bruised. It was further shown for appellee that the horse was seen by Mr. Hughes in the pasture on Friday before Sunday morning, and at that time he was "as gay as ever." The owner of the pasture further testified that on Saturday morning, as he was leaving for Harleton, he heard a train of appellant in the pasture blowing the whistle in little jerks for about one-half of a minute, making in all between 15 and 20 blasts. It was proved that a regular schedule train each of passengers and freight passed there at about 8:30 and 9 o'clock

that Saturday morning. The engineer of the freight train testified for appellant that he passed the pasture at the time stated, just behind the passenger train, and that he did not strike nor see the horse. T. D. Rudder testified that on Saturday morning he was plowing, and was within 20 or 30 steps of the railway track, when the two morning trains passed, and that between 12 and 1 o'clock he saw the horse of appellee grazing in the pasture, and that it was about 50 yards from him, and that he saw the horse the next morning dead about 100 yards from where he saw him grazing on Saturday. Fred Rudder testified that appellee had permitted him to ride the horse some, and that on returning from a baseball game between 5 and 6 o'clock Saturday afternoon he went down the railway track through the pasture, and saw the horse, "and went up to it and put my hand on it." This witness says he wanted to see the horse at the time because he "wanted to ride him Sunday, and I intended to ask Mr. Boaz about it when I got to town." About 7 o'clock Sunday morning the same witness saw the horse again, and it was dead. This witness further testifies that at the time he saw the horse Saturday afternoon the afternoon train going back toward Marshall had passed, and that the morning trains had not passed at the time he saw the horse dead, and that "No train passed along there from the time I saw it (the horse) on Saturday evening, until I found it dead Sunday morning." This witness was in a position, according to the record, to have actual knowledge and information of the movements of the trains on the railway at that time.

If, as said by appellant's witness, the horse was alive and in the pasture grazing between 12 and 1 o'clock, after the only two morning trains had passed, then it could not be said that either of the Saturday morning trains struck and killed the horse; and there is nothing in the record to suggest any reason why the testimony of the witness should not be taken as true and given weight and force. And if, as said by the other witness, he saw and put his hand on the horse, and the horse was alive and not injured, between 5 and 6 o'clock Saturday afternoon, after the afternoon train had returned, then it could not be said that the Saturday afternoon train had struck and killed the horse. And, moreover, if this witness had seen the horse dead Sunday morning before the morning trains of that day had yet come, it could not be said that either of the Sunday morning trains struck and killed the horse. And, further, if, as said by this witness, "No train passed along there from the time I saw it (the horse) on Saturday evening, until I saw it dead Sunday morning," and if this witness was in a position to be truly informed and have actual knowledge of the movements of the trains at that time, as it appears from the record he was, then it could not reasonably be said that it appears that the horse was struck by a train of appellant at any time between Saturday evening and Sunday morning, when he was found dead. There is nothing in the record to suggest any bias or mistake on the part of this witness, but the contrary fairly appears. Thus the evidence for appellee that the morning train was heard to blow 15 or 20 stock signals in the pasture, as a circumstance to show that the train had struck the horse, would be sufficiently overcome by the fact that between 12 and 1 o'clock and again between 5 and 6 o'clock and after the passing of the trains, the horse was seen in the pasture uninjured. And all the facts concerning the tracings on the ground below and away from the track, offered as circumstances to show that a train inflicted the injuries on the horse, would not sufficiently show that the train inflicted the injuries in the face of the affirmative fact that the horse was uninjured by either the morning trains or the evening train, and that no other train passed between Saturday evening and the time when the horse was found dead.

[2] It was incumbent upon the appellee, in order to discharge the burden of proof required of him, to show that the train struck and killed the horse. Ry. Co. v. Langford, 104 S. W. 920; Ry. Co. v. Earle, 14 S. W. 1068.

The cases cited by appellee of Ry. Co. v. Wilson, 84 S. W. 275, and Ry. Co. v. Evans, 78 Tex. 370, 14 S. W. 798, are not applicable here. For in the Wilson Case the court expressly finds the fact that "the evidence showed that the steer was struck by the engine," and afterwards moped about in a drawn condition; and in the Evans Case there was no affirmative testimony for appellant as in the instant case.

The judgment is reversed, and the cause is remanded for another trial.